24-3110 Tartt v. Unified School District No. 475. Counsel for appellant, if you'd make your appearance and proceed, please. Thank you, Your Honor. My name is Randy Rathbun. I will likewise bravely try and suggest that I'm going to reserve three minutes, but I don't know how that's going to go. Anyway, Mary A. Tartt had earned her retirement. She had toiled for years as a special ed teacher and then later as a principal in the schools of Alabama for decades. She was visited upon with so many different recommendations. She was commended by the governor's office. There was actually an article in U.S. News & World Report on her efforts in turning around schools in Alabama. She worked tirelessly and frankly, at the end, thought that she had earned her retirement. On February 13, 2020, she got a call from the superintendent of schools in Junction City who said, I need your help again because she had worked with him for a decade in the past. He said, I need you to come to Junction City because Junction City High School has 80% of our students are failing to meet minimum standards in math and 65% are failing to meet minimum standards in English language. The sacrifice was a big one for her. She had to move from Alabama. She sold her house. She was the principal caregiver for her mother, but she moved because it was a challenge that she could not say no to. She's left now with the reputation that's in shatters. She goes virtually not a day without thinking about the horrible way she was treated there. Mr. Ratman, I think we're all familiar with the case, so let me just try to cut to some of the issues here. Let's assume for the moment that the court could permissibly disregard certain portions of the affidavits. Let's assume that it had the power to do that, but it did not undertake that function appropriately as it relates in particular to Ms. Toomey's affidavit. Let's say there are certain parts that it disregarded. It should not have disregarded it. What do you think the remedy should be? Should we remand to allow the court to conduct a summary judgment analysis with the now proper universe of information, or should we de novo say, okay, court, you shouldn't have excluded paragraphs, whatever, so we're putting those in and we're going to do the summary judgment analysis? What do you think is the proper way to proceed? As you know, Your Honor, and as you mentioned, you have de novo review on this, and you, of course, have the right to look at it in an inference that favors my client. I don't care which one we do, frankly, because I think if the court would take a serious look at this case, then it cries out for help because I went to the person that was the HR director the year that Ms. Tarp was hired. She says, I can tell you that she was the only one that wasn't getting an evaluation. These other teachers were getting an evaluation. My client never got an evaluation. In fact, the only evaluation she got was phonied up, so it appeared like she had been evaluated in January, and that actually happened in April. Well, the problem is you're talking about Ms. Toomey now, the former HR, who was there her first year, the plaintiff's first year. Paragraph 11, she says, I was not aware of her affidavit. I was not aware that Eggleston and Gustafson were not giving Mariette, the plaintiff, the evaluations that Kansas law requires. I was not aware. So where's the personal knowledge here? And that's what Judge Melgren said. She speculates, well, she should have been given it, she was the only one that wasn't. She wasn't there. Actually, she was. She didn't know. Even if she was there, she didn't know. Judge, she was there the first year, and she testified, when I was there, the other principals were being evaluated. My client should have had. But she says she wasn't aware that she wasn't evaluated, so how can she then speculate about what the reasons were that she wasn't evaluated? All she can say is she can get in front of the jury and say, it was my job under Kansas law to make sure that she was evaluated every semester for the first two years. I know that the other principals were being evaluated because that was my job, and I also put the superintendent and the associate superintendent on notice that they needed to do that. Now, that to me shows something is going on here. How does that create, even if we assume that's the case, that she does have personal knowledge, and as Judge Holmes suggested, that there's some part of this affidavit that should have been considered by Judge Melgren. How does that part of the affidavit about the first year evaluation show pretext when she actually ends up, she doesn't have any problem that first year, it's the second year. She gets a contract. She gets a contract as she's an acting principal, right? And then she ends up after her first year getting the full-time principal position. So where's the pretext with respect to that action? She had a very successful first year. Then suddenly she isn't over. Well, do you see what I'm asking you, though? You've got to connect this. All of this has to be connected somehow to pretext, and that's a problem here. Here's the thing. You can't terminate someone without a good faith basis, and the way you get a good faith basis is to do an evaluation. They violated the law four times. They were required to do an evaluation. And she got a full contract despite that. Well, we know the first year she did until it came to the point where the new board president decided she wasn't going to get it. She didn't get it. Obviously, I need to be frank about this. This whole case to me turns on Ron Johnson, and Ron Johnson, I mean, we have shown through like the number two supervisor in the district throughout was referring to him as a racist. There were repeated discussions of him coming to the school uninvited, walking around looking for negative stuff on Ms. Tartt. Let me, if I may, ask two more questions about the affidavits. As it relates to the Toomey affidavit, we're following up to some extent on Judge Moritz's line of questioning. What is the theory under which you're presenting the Toomey affidavit? I mean, because if the question is, is she a fact witness and essentially a witness who was there during the period and could speak to that, there's a problem. I mean, it's almost as if what you're trying to do is suggest that she was some sort of lay expert witness in which she had knowledge of all of these things and therefore could speak about them. These are the best practices, or these are the practices that existed when I was there, and therefore I'm speaking to that issue. This is what the lay of the land should have been. What's the theory under which this evidence would have been admissible? Thank you, Your Honor. My theory is simply this. All the other principals were getting evaluations. Ms. Tartt wasn't. You cannot legally terminate someone without evaluating them. I guess just the point would be that in year two, Ms. Toomey was not there. And if she's going to be speaking to whether people were getting evaluations or not, it would be difficult for her to do that if she was not there. If the theory for these averments in the affidavit, if that theory was she's essentially a fact witness who was present, she knew they weren't getting the evaluations, that's one line of admitting it. Another would be that basically she's an HR expert who happens to be familiar with the practices of the district, and she says, well, this is what they should do. And then the question is, I believe I've been told she wasn't doing it. That's what I understand to be going on in this affidavit. At the very least, Your Honor, there was an inference here based upon the fact that the year she was there, all other principals got evaluated and she didn't. And I think the inference that you draw there is that for some reason she was not being evaluated. And the evidence that she wasn't being evaluated would be coming from a different source, that is coming from Ms. Tartt.  Okay, quickly, on Mr. Jacobson and Ms. Tartt's affidavits, the disregarding portions that the district court did, I don't see any objection to that. You seem to be focusing on Toomey. Am I correct in that? Well, no, Your Honor, and here's the reason why. I did talk about Jacobson and Sons simply because this turned into a war of affidavits, and they lined up a bunch of people to say that my client was an ogre. Both in the Toomey, the Jacobson affidavits, I brought out the fact that they talked about what a great principal she was, what a caring individual she was. And had I known this was going to turn into a war of affidavits, I would have submitted more affidavits. Okay, well, that's past tense. I'm talking about on appeal now. Are you focusing only on Toomey is what I'm getting at. That's what I sensed in your briefing. No, I mentioned in the Jacobson affidavit, it was offered on pretext in terms of, they said, well, there was no counter put together. And I offered his affidavit to show, indeed, there was countering being done. It was available to everybody. So you're objecting to the court's disregarding of portions of the Jacobson affidavit on appeal. Absolutely. Okay. And your honor, it's just simply this is the this is a tough case because, frankly, when you have all the power, it is easy to get people to be negative about someone. I found two witnesses that I thought absolutely controverted the stuff that the defendant was saying. And, you know, in hindsight, I shot five or six more affidavits. So we could have if we're going to have a real decision on affidavits, at least my full side could have got her. Well, you have the fact that once she becomes the actual principal, she she hires, as I understand it, three assistant principal. Yes. And each one of them then is complaining about her behavior towards them and therefore hires. And that's one of the primary reasons that the district gives for terminate her, along with some other, you know, tasks being behind schedule. And some of these administrators looking to leave because of her behavior. But they also recognize that there are a lot of people who who really liked her and there were a lot of people who were really offended by her. And so it was one of those situations. Yeah. And that's the problem. But the people she hired as her assistant principals, how do you address that? That certainly doesn't help your pretext argument. I tried to address that in her affidavit, showing that her behavior was not the motivating factor for some of these people leaving. And I think she adequately explained that in her affidavit. And certainly to the inferences that we're entitled to on summary judgment, I think that carries the day there. Now, clearly, I. Well, the question is whether the employer, you know, in good faith believed that these were the reasons, you know, if their reasons for her termination of her employment were in good faith, that's what matters. But as this court knows, under Corinthians 2014, 10th Circuit case, the 10th Circuit says even if self-serving one affidavit can offset the affidavit on the plane, it can offset a mountain of affidavits from the other side if it creates an inference that she wasn't being treated fair. Counsel, can I ask you a question about your retaliation claim? I wanted to ask you a question about your retaliation. Yes. So why shouldn't we affirm the grant of summary judgment on that claim for the same reason that the district court gave, which is that you didn't provide any argument? You didn't marshal any arguments on on pretext as to retaliation. Here's how I view that. All parties, including the district judge, acknowledge that both claims were covered by the same set of facts. There wasn't a set of facts dealing as to the discrimination claim. There wasn't a separate set of facts relating to the retaliation claim. The court specifically said there's only one set of facts in this case. Throughout my brief, I talked about pretext leading to termination. With my excellent 2020 hindsight, I should have dropped a footnote saying same arguments as to discrimination applies to retaliation. But I worded it broadly enough in my brief so that I didn't have to regurgitate the very same stuff to this court. So your factual basis you're contending is the same as the legal standard, the same? I'm sorry. Is the legal standard the same when we're evaluating retaliation and looking at pretext? I think so. So that being said, your honor, I this is one of those cases where you've just got to let the jury decide this thing, because they're so I mean, I, I presented these witnesses that were just so strongly in her favor. I don't understand. I mean, they they filed a motion to strike virtually every paragraph in all affidavits. And that's, you know, there's so much law that you can't do that. It's disfavored. And when you look at it, the problem is when the judge says, I'm going to disregard this, I'm going to disregard that. I mean, it took the whole case away from us. And there was no these were personal observations by someone with experience and someone was right there. Thank you very much. Good morning. My name is Terrell Mock, and I'm here representing USD 475. The the affidavit that the portions of those affidavits that were stricken from the record by Judge Melbourne were done so because they failed to meet the rules of admissible evidence. Excuse me. And and he he was very, I think, judicious in that he didn't strike full paragraphs. He went through every single one of them and only struck out those sentences that, frankly, lacked personal knowledge. Let's talk about the to me affidavit. First question is, if if we were to disagree with the exclusion of that, the district court erred in disregarding some of the to me affidavit, what would be the appropriate remedy in that situation? Should we conduct the de novo review of summary judgment, putting those back in? Or should we remand to the district court to do a summary judgment with the proper universe of information? I think you conduct the de novo review with that in consideration. But as this court knows, those decisions as evidentiary decisions, you are to review for an abuse of discretion. Yes. All right. Yes, that's right. But going to now the question as it relates to the to me affidavit, why could not miss to me having been in the district, having had experience as an H.R. professional in that district? Well, first of all, I would say they did do it that way. There's nothing in the record. That's not that's not my question. Okay. What she's saying and the reason I believe it's it's struck is because of the way it's written. If you look at paragraph 11, the portion that Judge Milgram struck was it is my understanding that Dr. Eggleston and Dr. Gustafson are stating that there they were not aware of the requirement of evaluations. I also understand they are now trying to say that no school administrators were being evaluated. This is not accurate. That's that's the part of that paragraph that was struck. It's based on what information? It's not accurate that she that her understanding isn't accurate. Right. She's being fed inaccurate information and then providing an opinion on inaccurate information. Nobody testified that administrators weren't evaluated. They testified they were evaluated one time here. And I also think it's important for this court to understand that evaluation process is this key construct that's used by districts across the state of Kansas. And in the way that Junction City did it, it was really a year long evaluation. I mean, it starts in the fall. It starts with a self-evaluation that then the evaluator takes and provides feedback upon. It goes through all these constructs. It's like 45 pages long. And so she was being evaluated that entire year that it was it was completed in April. But the evaluation was occurring. Well, again, if if the if Miss Toomey says, all right, I've been in this district for a long time, I've been an HR professional, they don't do it that way. That's not the way they did it when I was there. That's not my understanding what the proper evaluation looks like. Why is that testimony inadmissible? What is that way? That way is what you just said, which is that it's a year long process. And that's how evaluations take place. And she says, well, I was there and that's not how they take place. Well, if that's what the testimony was, which it's not, then it would be admissible because it would be based upon her personal knowledge of what happened in 21 or in 2021, whatever. Why isn't she saying that there are a lot of conditional statements here in which she says that this is, let's say, talking about what the process was. I was not aware. Talking about what Kansas law requires. System was programmed with the cycle for each administrator, blah, blah, blah. Well, what's wrong with that? Well, again, I think what's wrong with it is it's based upon this information that she lacks personal knowledge of. If Ms. Tartt was not evaluated, which she was, it was a conscious decision on the part of the administration. Okay, so she's speaking to the mind of the administration. KSCE keep maintains a record of, I'm not sure what that is, evaluations performed. And what's wrong with that particular statement? Doesn't she have personal knowledge of that? Well, she could say that when I was there in 21, 22, they kept a record of this. Yeah, that's fine. And they are set on a cycle and that the system sends reminders. And I did as well. That's all. And that's all excluded. Those sentences are excluded. Because I think, as I understand his opinion, is she's talking, she's saying this happened in the year she wasn't there. That's well, that's not what she says. She says they mean she's talking. Well, I mean, she says, well, she doesn't know what was happening the year. She knows. She knows. She doesn't. But that's not the qualifier. She says that they maintain records. That's yes. That's present tense. And of course, she's not there in 2022. But I didn't understand that. Is that your view that that was the district court's rationale? That's my understanding. Well, she was there in 2021. And she says the system sends reminders. And I did as well. And I would send out email reminders to the administrators, including Dr. Eggleston and Dr. Gustafson, her supervisors, advising them of their evaluations due out. So I think she is saying I was there and this is what I did. And that's apparently, although it's not clear, the basis for her statement that if she wasn't evaluated in 2021, it was a conscious decision on the part of the administration. Again, I think her speaking to the decision of the well, that may be that may be. But she does have some specific information. Can we talk about the the evidence of racial animus that is fairly significant? For for instance, Miss Gustafson, Gustafson, she actually suggested and I think this was in an email, maybe was it through discovery? I don't know that school board member Johnson's motives was that he was coming after black administrators. No, that's not what she said. All right. What did she say? She said. And where was was this in this email text message text message between Dr. Gustafson and her at the time? Very, very good friend. And in that text that produced through discovery, it was produced through discovery. She was subpoenaed. The text messages were subpoenaed. And she said. And in the text exchange, there was talk about Mr. Johnson being in the high school more often than not or more than normal. Context being this was a brand new high school. They just built it hugely expensive, brand new space. And so he was going over there a lot. And and so her friend, Margie says, makes that statement. And Deb Gustafson says Ron Johnson is out to get Dr. E. And Marley Marley, the two black administrators. But she doesn't say. They don't say, well, we know they are. Well, yes, she knows they are. Yes. And she says he's out to get them. Dr. Johnson. Yes, she does. But I if you look at that statement alone, there's not a race. We don't look at it alone. We look at it in combination with other other factors. What about the same same person, Dr. Dr. Yes, Dr. Gustafson Gustafson making critical comments about the plane of herself and about how she stares people down and doesn't avert her gaze. Yes. And that's what prompted the retaliation claim. That's what prompted the protected activity. Right. Right. So, you know, they had been getting a lot of complaints, right, from administrators, from teachers, from different staff about Miss Tartt. And Dr. Gustafson was attempting to meet with her to relay to her some of these complaints so that she could improve, so that she could understand what the what the complaints were against her. And it was that she was basically staring people down and it was making them really uncomfortable. If she was in a confrontational space or, you know, if if they would say something that she didn't like, instead of responding, she would just sit there and stare. And I think what Miss what Dr. Gustafson ultimately testified to and what she told Dr. Eggleston and what she told Miss Tartt in that follow up meeting was I didn't mean anything by that other than I'm trying to help you understand how people are perceiving you in a negative way and what's making them uncomfortable so that those things change. Did she suggest that she should be averting her great gaze? No, that was that was the plaintiff's implication? Not at all. And she and the plaintiff explained to her how that made her feel. She did. As a person of color. She did. And how that might have been interpreted by her. Yes. And they had this whole conversation about it. And that conversation's recorded. It's in the record. You know, they had a conversation about this and, you know, that wasn't. Well, if we draw some inferences from this, along with I think it's the add value comment. Was that Eggleston? There was a comment about it. Or she doesn't add any value. I believe that's from an affidavit as well. I'm not quite sure that's. And there's Sally who said she's not our kind. You need to come and ask me. That's Sally. Sally. Uh huh. There's a number of these these comments. There's if we're talking about the discrimination claim, are we talking about the retaliation? Well, let's talk about. Because I do think there's differences. All right. Well, let's talk about the discrimination. OK, so if we're talking about the discrimination claim, what that requires, what pretext requires is ultimately that they show that the reasons that were put forth to the Board of Education by Dr. Eggleston and by the Board of Education for their reasons for terminating her were unworthy of belief. The maxims right of law in this circuit. True. To that point, what Judge Moritz, what I hear her saying is that there were some from just from this. There are at least two instances in which there were explicit racial comments directed towards board the board member, Mr. Johnson. I mean, you know that supposedly he was a racist. I mean, that was, I guess, Miss forgot Henry or so. However, her name is pronounced. That's how she responded when they said they're going after them. And she said racist. That's what Margie said. That's not what Dr. Well, in another instance, she did. Supposedly there's an exchange she had with Miss Tartt where she said, don't worry about him. He's a racist, right? That's the testimony in the light most favorable to the plaintiff. I think we have that is the testimony. Well, why isn't that testimony relevant to the question of whether the fix was in essentially be as it relates to the discrimination claim that that all these things were made up? Well, you know, you have to think to who made that, who made the recommendation that Miss Tartt be terminated. Dr. Eggleston did.  Okay. Dr. Eggleston is the same one who recruited her to come to 2475. There's absolutely no racist comments attributed to Dr. Eggleston, who was the ultimate decision maker for her termination. The Board of Education. That's right. And so so that is the that entity and whether they were animated by racial discrimination is what is at play here. Okay. And I agree with that. And there's there's a lot of case law out there that suggest one member's vote or even one member's racial animus. If we assume that to be the case here is insufficient. Well, what about the fact that there were there was that that exchange about two people who are going to get on the board? And you ended up with at least two people who were alleged to have some sort of animus. Right. I don't believe that's in the record. Your Honor. Well, I'll find it. Thank you. If we look at I would like to to direct the court's attention to the Jaramillo case versus Adams County Schools, the 2012 case. And it has facts that are that are pretty similar to these. She was a Hispanic principal. There was testimony from another board member that that another board member was was racist. And in and in that the court concluded that was insufficient. He testified that I mean one board member testifying against another board member. You know, that whether he thought racism was involved in the termination decision, he answered yes and explained he felt the termination was a product of institutional racism in the district. All of all of those things. And the 10th survey in that case concluded all of that evidence, which I believe is more significant than that here, was mere conjecture that an employer's explanation is pretext for intentional discrimination is an insufficient or insufficient basis for denial of summary judgment. OK, so I think that and he said nothing in that board member's testimony other than vague references to institutional reference or racism or past experience suggests he could be on point. Let me clarify one point before you sit down in in the appellant's briefing. There's a reference to the position being advertised as vacant in March of twenty twenty two. I didn't see any rebuttal to that point in your briefing. Is do you agree that was true? And if that's true, that's position that advertises vacant in March twenty twenty two, not fired until May. Right. Right. They they had removed her from the high school after spring break because that the fever pitch was such that work wasn't getting done. Nobody was working for her. Things were stalled out. So they pulled her to the administration building. And I think Dr. Eggleston knew at that time, you know, having her be in that position was not effective. And so that was, in effect, a removal from the position effect, a termination from the position, although they were not authorized to do that at the time. Well, they removed her from the building to save the building. OK. And then I have a question. And then they pulled her to the district where they gave her work there. They she continued to work. And I think Dr. Eggleston's hope was we all know this wasn't the position she was hired for. But what is your understanding of what the plaintiffs the plaintiff's understanding is of the adverse action here? Well, she was ultimately not renewed. So that's that's it. Right. And then for the retaliation claim, what is the protected activity? The complaint about her meeting with Dr. Eggleston. So were there other adverse actions sort of in play? Here's Chief Holmes is referencing sort of the way in which her termination ultimately unfolded. Yeah, I think that's their argument. You know, I mean, she was put on an administrative improvement plan. But I would also point out to the court, you know, if you look at that administrative improvement plan, there's there's five major things. Identify in that plan that she has to work on. And those five things were identified before she engaged in any protected conduct. And there's case law out there suggesting, I mean, if the ship's already moving, just because you engage in protected conduct doesn't mean you get to stop. Stop it. What should we think about a board that has a member who at least a couple of people understand is racist and is trying to get rid of. The two board members who happen to be are not board members, but administrators who have to be black. And this person, Dr. Gustafson, can't say your name. That's OK. That's just a guess. This allows that board. Knowing one of the members might be out to get her and might be racist and could be talking to the other members. We don't know. You do. What about what about. But we don't know. We have a decision maker who knows this about a board member. She's not a decision maker. Well, she's the supervisor of this individual who eventually is part of the termination. I presume, you know, I mean, she there's a recommendation that comes and she talks to her about her problems. And then she lets this board, who she knows may be compromised, make this decision without saying without saying anything. Right. And I understanding that we're we're we're assuming Gustafson told Tart that Ron Johnson was a racist. But I don't think the court can ignore the fact that she denied the statement and testified under oath. She has no reason to believe he's. We also have her text back and forth with her friend. But she didn't call him a racist. She said he was he was out to get these two individuals. And the other person, Margie, calls her, calls him a racist. And she doesn't say, oh, no, no, no. That's not it. No, no, she doesn't. And then she says, all right, board, go ahead. And you you contemplate her terminating. I would direct the court's attention back to the line of cases that suggest even if we consider that to be true, even if we if we agree with the assumption and belief that the president was racist, is one one person on a seven member vote. You have affidavits and evidence from all of the rest of them indicating why they made their votes and those that and their honest belief in this. Was Johnson president when she was there? Yes. I, I guess the you say one person. And I guess what I'm focusing on is Gustafson, Texas, Margie, and November 20, 2021. And she says, make no mistake, Hudson and Hatcher. And in in a parenthetical, Johnson and Hayden are after Dr. E and Mr. Jackson. And and that's the that is the text for from which the response came racist. So the point is, we're not just talking about one person, are we? Again, I don't believe that's her saying she thinks that's not what. Well, I don't think you can infer that from from that evidence. OK. Thank you. Thank you. If you want it, you have 30 seconds. You have more than that. You can have a minute. Go ahead, please. You know, it's critical here that we look at context. When I took Gustafson's deposition, I said, my client says that you said that he was a racist. Mr. Johnson was a racist. And I said, did you say that? And she said, I don't recall. And I said, now, you know, the difference between denying that you said something versus not recalling it. And I said, let me ask you again, do you deny calling him a racist? I don't recall. I. So now she has changed her testimony. Didn't she have an affidavit where she denied it? Yeah. Afterwards. But after I took her deposition, she said, I don't recall. And I made certain to get it on the record that she knew the difference between not recalling versus denying. If you look at the time frame on this, they removed her from the building. They took away 75 percent of her responsibilities. So that actually, in effect, was adverse action right there. And they were advertising her position seven weeks before they terminated. Thank you, counsel. Case is submitted. Thank you for your fine argument.